David R. Nielson (6010)
Nathan D. Anderson (15809)
SKOUBYE & NIELSON JOHANSEN, LLC
999 East Murray Holladay Road, Suite 200
Salt Lake City, Utah 84117
Telephone: (801) 365-1030
Facsimile: (801) 365-1031
Email: david@snjlegal.com
Email: nathan@snjlegal.com
*Attorneys for Green Property Solutions, LLC*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF UTAH

| | |
|---|---|
| THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY, a Delaware corporation<br><br>Plaintiff, Counter-claim defendant,<br><br>v.<br><br>GREEN PROPERTY SOLUTIONS, LLC, a Utah limited liability company; RIDGEBROOK OWNERS ASSOCIATION, a Washington non-profit corporation<br><br>Defendant, Counter-claimant. | **MOTION FOR SUMMARY JUDGMENT OF GREEN PROPERTY**<br><br>Civil No. 1:19-cv-00010-DB<br><br>Judge Dee Benson |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and DUCivR56-1, Green Property Solutions, LLC ("Green Property") submits the following Motion for Summary Judgment.

## INTRODUCTION & RELIEF SOUGHT

In 2012, Green Property blew insulation into the attics of the Ridgebrook Condominiums in Issaquah, Washington. Six years later, the Ridgebrook Owners Association (the "Association") filed a complaint in Washington ("Washington Lawsuit") alleging that "the blown-in insulation . . . blocked some of the condominiums' ventilation ports" and partially blocked some of the insect screens on several eave vents. This, the Association alleged, led to moisture buildup in the attics, which damaged the roofs' plywood sheathing and raised concerns about possible (though yet-undiscovered) mold. Green Property tendered its defense of the Washington Lawsuit to its insurer, The Cincinnati Specialty Underwriters Insurance ("Cincinnati"), which denied a defense and filed this declaratory judgment action.

Cincinnati refused to defend Green Property under its commercial general liability policy ("Cincinnati Policy" or the "Policy") for three reasons. First, citing *H.E. Davis & Sons, Inc. v. N. Pac. Ins. Co.*, 248 F. Supp. 2d 1079 (D. Utah 2002)—a case both Cincinnati and its counsel knew was no longer good law—Cincinnati alleged that the property damage was intentional rather than accidental and therefore not an "occurrence" under the Cincinnati Policy. Second, it alleged the "Your Work" exclusion applied to deny coverage. Finally, it alleged the "Fungi" exclusion applied because the Washington Lawsuit references some discoloration of the plywood sheathing and "concerns" about "the spread of mold spores" (an issue the Washington Complaint specifically says is "still being investigated").

None of these are valid reasons to deny Green Property a defense. First, Utah's state and federal opinions make clear that where defective workmanship causes damage to property other than the insured's own work product, such damage results from an accidental "occurrence" no

2

matter the insured's intent or whether the damage was foreseeable. Second, the "Your Work" exclusion applies only to damage to Green Property's blown-in insulation work. Yet, here, most of the damage was to the roof's sheathing (that is, the Association's property), something Green Property did not work on. Third, the "Fungi" exclusion does not apply because the Washington Lawsuit does not allege property damage caused by fungus or mold. Instead, it alleges property damage caused by moisture buildup in the attics.

Green Property's motion for summary judgment, therefore, seeks an order from the Court stating the following:

1. Cincinnati has a duty to defend Green Property under the Cincinnati Policy (Policy No. CSU0020475) against all claims asserted against Green Property in the Washington Lawsuit.

2. Cincinnati is hereby ordered to immediately furnish a competent defense to Green Property in the Washington Lawsuit, at Cincinnati's expense, and to reimburse Green Property for the defense costs it has incurred therein.

3. Cincinnati's first claim for relief (seeking a declaration that Cincinnati has no duty to defend Green Property) is dismissed with prejudice and its remaining claims (seeking declarations as to Cincinnati's indemnity obligations) are dismissed without prejudice, subject to potential refiling after the Washington Lawsuit has been resolved.

4. The Court finds that Cincinnati was acting in bad faith or was stubbornly litigious so as to justify an award of costs and attorney's fees in this action in an amount to be determined by affidavit.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*Parties & Relationship*

1. Green Property is a Utah LLC, headquartered in Utah, specializing in residential and multi-family energy saving construction. ECF 2, ¶5.

2. Cincinnati is a Delaware corporation headquartered in Cincinnati, Ohio. ECF 2, ¶ 4.

3. Cincinnati issued Commercial General Liability Policy No. CSU0020475 to Green Property ("Cincinnati Policy" or the "Policy").  *Compare* ECF 7, p.9 at ¶17 (attaching a copy of the Policy as ECF 7-2) *with* ECF 8, ¶17 (admitting the attached copy of the Policy is true and accurate).  For the convenience of the Court, a copy of the Policy is included in the Appendix of Evidence as document 1.

4. The effective dates of the Cincinnati Policy were July 19, 2012 to July 19, 2103. ECF 8, ¶17.

*The Washington Lawsuit*

5. On December 14, 2018, the Ridgebrook Owners Association ("Association") filed a lawsuit against Green Property in the Superior Court of the State of Washington for King County, captioned as *Ridgebrook Owners Association v. Green Property Solutions, LLC et al.*, No. 18-2-57189-8 SEA ("Washington Lawsuit" or "Washington Complaint").  ECF 2, ¶ 11; *compare* ECF 7, ¶ 8 (attaching a copy of the Washington Lawsuit) *with* ECF 8, ¶ 8 (admitting the attached copy of the Washington Lawsuit).  A copy of the Washington Lawsuit is included as Appendix Document 2.

6. The Association claims to have hired Green Property to blow insulation into the attics of the Ridgebrook Condominiums in Issaquah, Washington. App. 2, pp. 2-3.

7. The Washington Complaint alleges that, on or about December 17, 2012, Green Property blew insulation into the attics of the Ridgebrook Condominiums. App. 2, ¶8.

8. The Washington Lawsuit alleged that "the blown-in insulation . . . blocked the building ventilation ports" and partially blocked some insect screens on several of the eave vents. App. 2, ¶¶ 9–10; *compare* ECF 7, ¶ 9 *with* ECF 8, ¶ 9.

9. The Washington Lawsuit alleged that these blockages:

   a. "[C]reated a lack of proper ventilation in the attic, which led to excess moisture buildup in the attics. This in turn spread moisture condensation on the exposed plywood surfaces." App. 2, ¶13.

   b. Caused a "heavy black discoloration of the plywood sheathing in the attics, in varying degrees within each building." App. 2, ¶12.

   c. "[R]esulted in significant damage to the roof plywood sheathing in the buildings." App. 2, ¶14.

   d. "[R]esulted in concerns about the spread of mold spores and other airborne organics in the residential units," but that this issue was "still being investigated." App. 2, ¶14.

10. The Washington Lawsuit alleged that the above-referenced problems require the "removal of the roof shingles, roof underlayment and roof flashings currently installed on top of the roof plywood sheathing. The damaged roof-sheathing materials will need to be replaced with substantially equivalent materials. Once the sheathing is replaced, a new roof underlayment, roof

flashings and roof shingles must be installed. . . . Further, the ventilation ports must be cleared from blown-in insulation blockage . . . ." App. 2, ¶15.

11.     The estimated cost for these repairs is $300,000. App. 2, ¶16.

*Cincinnati denies its duty to defend Green Property*

12.     Shortly after the Association's Complaint was filed, Green Property tendered the defense of the Complaint to Cincinnati. *Compare* ECF 7, ¶12 (stating Green Property tendered defense to Cincinnati) *with* ECF 8, ¶12 (admitting the same).

13.     On January 29, 2019, Cincinnati responded by letter and denied any duty to defend or indemnify Green Property against the Association's Complaint. *Compare* ECF 7, ¶13 (attaching copy of denial letter as ECF 7-3) *with* ECF 8, ¶13 (admitting the attached denial letter). A copy of the denial letter is attached as Appendix Document 3.

14.     The letter stated, "Cincinnati has concluded that all the claims and causes of action are excluded from coverage by the Policies issued to [Green Property] by Cincinnati. Therefore, Cincinnati has no duty to provide [Green Property] defense counsel in this Lawsuit and, thus, [Green Property] will need to hire an attorney as soon as possible . . . ." App. 3, p.2.

15.     Cincinnati's denial letter provided the following reasons for its denial:

    a. It alleged there was no "occurrence" as defined by the Cincinnati Policy because the Association's Complaint alleged intentional acts in connection with installing the insulation. App. 3, pp.9-10.

    b. It alleged the "Your Work" exclusion applied and excluded coverage. App. 3, pp.9-10.

    c. It alleged the "Fungi" exclusion applied and excluded coverage. App. 3, p.10.

16. On February 7, 2019, Cincinnati filed this declaratory judgment action, asking this Court to declare Cincinnati has no duty to defend Green Property in the Washington Complaint. ECF 2.

17. Cincinnati's declaratory judgment action asserts the same reasons for denying coverage as those found in the denial letter. *Compare* ECF 2, ¶ 19(a)–(c) with App. 3, pp. 9-10.

18. On March 6, 2019, Green Property filed its Answer and Counterclaim asking this Court to declare Cincinnati had and continues to have a duty to defend Green Property under the Cincinnati Policy for all causes of action asserted in the Washington Complaint and that it acted in bad faith by refusing to undertake Green Property's defense. ECF 7.

19. On March 27, 2019, Cincinnati filed its Answer to Green Property's counterclaim. ECF 8.

## ARGUMENT

An insurer's duty to defend a policy holder is broader than the duty to indemnify. *Deseret Fed. Sav. & Loan Ass'n v. U.S. Fid. & Guar. Co.*, 714 P.2d 1143, 1146 (Utah 1986). First, the duty to defend is triggered whenever a complaint "alleges a risk within the coverage of the policy." *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 16, 140 P.3d 1210. That is, "In Utah, an insurer has a duty to defend when the insurer ascertains facts giving rise to **potential liability** under the insurance policy." *Basic Research, LLC v. Admiral Ins. Co.*, 2013 UT 6 ¶ 7, 297 P.3d 578 (emphasis added). Second, the duty to defend even one claim "obligate[s] [an insurer] to provide a defense to the entire suit." *Benjamin*, 2006 UT 37, ¶ 25. Third, the duty to defend exists regardless of the merits of the underlying claims. *Id.* ¶ 22. An insurer has a duty to defend its insured until it can establish that the claims are not supported by the facts: "Where factual questions render coverage

7

uncertain, as is the case here, the insurer **must defend** until those uncertainties can be resolved against coverage." *Id.* Put simply: "When in doubt, defend." *Id.* (cleaned up).

Whether an insurer's duty to defend is triggered "is determined by comparing the language of the insurance policy with the allegations of the complaint." *Basic Research*, 2013 UT 6. ¶ 7. A court "must examine the allegations in the complaint in light of the applicable provisions of the insurance policy to determine if any duty to defend exists." *Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575, 578. "If the language found within the collective 'eight corners' of these documents [the complaint and the insurance policy] clearly and unambiguously indicates that a duty to defend does or does not exist, the analysis is complete." *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 18, 266 P.3d 733.

All factual uncertainties or ambiguities are resolved in favor of the insured. *Benjamin*, 2006 UT 37, ¶ 22. So an insurer disclaiming any duty to defend bears the "heavy burden" of showing that no facts consistent with those alleged in the underlying complaint could give rise to any situation where coverage existed under the policy. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089–90 (Colo. 1991). Similarly, under Utah law, an insurer cannot disclaim its duty to defend without first proving conclusively that the allegations in the complaint are solely and entirely outside the coverage of the policy. *Simmons v. Farmers Ins. Group*, 877 P.2d 1255, 1258 n.3, (Utah App. 1994) (stating insurer denying a duty to defend must establish that all claims fall outside of coverage or are exempted from coverage).

Cincinnati has a duty to defend Green Property against the allegations in the Washington Complaint. The Policy obligates Cincinnati to defend Green Property for property damage caused by an "occurrence" inside the coverage territory and within the policy period so long as no

exclusions apply. App. 1, p.15. Here, there is no dispute that the property damage occurred inside the coverage territory and within the policy period. The only questions are (1) whether there was an "occurrence" and, if so, (2) whether the Policy's "Fungi" or "Your Work" exclusions apply.[1] These are legal issues that this Court can and should decide on summary judgment by looking at the four corners of the Policy and the Washington Complaint. Utah R. Civ. P. 56; *Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.*, 949 P.2d 337, 340 (Utah 1997) (citations omitted).

## I. There was an "occurrence."

The Washington Complaint alleges that Green Property's blown-in insulation blocked the attics' ventilation, which caused moisture build up and damage to the roofs' plywood sheathing. App. 2, ¶¶ 9–14. Cincinnati says that this damage was not the result of an "occurrence." App. 3; ECF 2, ¶19(a). An "occurrence" is defined in the Cincinnati Policy as "an accident":

> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

App. 1, p.28. Cincinnati says that the Washington Complaint does not allege an occurrence because it "allege[s] acts that are not 'accidents' . . . and instead state[s] allegations of intentional acts in connection with installing the insulation defectively and blocking the ventilation system." App. 3; ECF 2, ¶19(a).[2] Cincinnati is wrong. Nowhere in the Washington Complaint is it alleged that

---

[1] Cincinnati cannot raise additional grounds for denying coverage beyond those found in its denial letter, as those have been waived. *See Moore v. Energy Mut. Ins. Co.*, 814 P.2d 1141, 1146-47 (Utah App. 1991) (insurer waives its right to rely on exclusions and policy provisions not included in the insurer's original denial of coverage). *See also Schippers v. State Farm Mut. Auto. Ins.*, 518 P.2d 1099 (Utah 1974) (insurer cannot defend coverage suit by relying on reasons not included in denial letter).

[2] The term "occurrence" is broader than the term "accident" and is to be broadly and liberally construed in favor of coverage for the insured. *See Cincinnati Ins. Co. v. AMSCO*

Green Property intentionally damaged the building's sheathing. The damaged sheathing was an accident, and thus an "occurrence" under the Policy.

The Policy does not define "accident" but Utah Courts define the term as "means which produce effects which are not their natural and probable consequences":

> The word ["accidental"] is descriptive of means which produce effects which are not their natural and probable consequences. . . . An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequences of his deeds.

*Richards v. Standard Accident Ins. Co.*, 200 P. 1017, 1023 (Utah 1921) (cleaned up). "[N]atural and probable consequences" are those which "ordinarily follow[ ]" or "ought to be expected" from the action and are not an accident. *Id.*.

More simply, to determine whether property damage is an accident for purposes of insurance, the Court looks at whether "**the result was intended or expected.**" *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 29, 203 P.3d 962 (emphasis added) (quoting *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, ¶ 11, 175 P.3d 566).

Here, Green Property blew insulation into the attics of the Washington condominiums. The "natural" or "expected" consequence of blowing insulation into an attic is to protect the building by reducing the exchange of heat, not to cause water damage to sheathing. Damaged sheathing is not the "natural and probable" result of blowing insulation into an attic, rendering such damage "accidental" and constituting an "occurrence."

---

*Windows*, 921 F. Supp. 2d 1226, 1241 (D. Utah 2013); *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437, 443 (D. Kan. 1990); 7A J. Appleman, Insurance Law & Practice §§ 4492–93 (Berdal ed. 1979).

10

### A. Green Property's alleged, unproven intent is irrelevant.

Cincinnati says the damaged sheathing was not an accident, but an "intentional act[ ] in connection with installing the insulation defectively . . . and/or doing the work in a defective or substandard manner." App. 3, p. 9; ECF 2, ¶19(a). This allegation is entirely of Cincinnati's own creation, as the Washington Complaint does not accuse Green Property of intentionally damaging anything. Cincinnati offers no proof that Green Property intended to damage property or perform defective work. Instead, it merely infers or assumes as much. But Cincinnati cannot deny its duty to defend Green Property based on unproven inferences or assumptions. *See Benjamin*, 2006 UT 37, ¶ 24 ("Inferences and assumptions about an insured's intent to injure are improper and inconsistent . . . with . . . our oft-repeated instruction that insurance policies should be construed liberally in favor of the insured . . . so as to promote and not defeat the purpose of insurance.").

More importantly, Cincinnati's arguments would make insurance worthless. There would be no such thing as an "accident" or "occurrence" because when an insured performed work, the insurer could claim—without any proof—that because it was done defectively or in a substandard manner (an "accident"), the insured must have intended the injury, thereby allowing Cincinnati to deny both a defense and indemnity on the grounds that the injury was not an accident.

This is not the law in Utah. Utah courts "do not examine whether an act is intentional or deliberate, only whether the result was intended or expected." *Caleb*, 2008 UT 1, ¶ 11. Stated another way, "to determine whether an injury is intentional or accidental, we consider whether the 'result was intended or expected,' **rather than focusing on whether the act causing the injury was intentional**." *Helf*, 2009 UT 11, ¶ 29 (emphasis added). "Under this approach, an intentional act 'may result in an accident if the **result** was unexpected and unanticipated." *Id.* (emphasis in

11

original).³ The focus must be on the expected result, not on whether the insured's conduct was intentional.

Based on both *Caleb* and *Helf*, two Utah Supreme Court decisions, Cincinnati is wrong to deny coverage based on its unfounded accusation that Green Property intentionally damaged property.

### B. Foreseeability is also irrelevant.

Cincinnati also appears to allege that there is no "occurrence" because it was "reasonably foreseeable" that if Green Property performed defectively (by accidentally blocking the vents) there would be moisture in the attics. App. 3, p.9-10; ECF 2, ¶19(a). Employing such a foreseeability standard would render the Policy illusory. There would be no such thing as an "accident" or "occurrence" for a contractor because whenever an insured performed defective work, the insurer could always claim the harm was the "natural and probable" result of performing defective work and thus not an "accident." Conversely, if the harm was not foreseeable, the insured could not be held liable for negligence (as foreseeability is a necessary element of negligence), leaving the insurer with nothing to indemnify. Cincinnati would thus have no indemnity obligation under either scenario.

Yet again, the Utah Supreme Court in *Caleb* rejected the idea that foreseeability has any application in determining whether there is an occurrence under an insurance policy: "We have

---

³ Other courts reach this same conclusion. For example, Tenth Circuit noted that "most federal circuit and state supreme court cases line up in favor of finding an occurrence" where there is "unanticipated damage to nondefective property resulting from poor workmanship." *Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272 (10th Cir. 2011). As the Texas Supreme Court explained, "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is the result would have been different had the deliberate act been performed correctly." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007).

clearly held that the test is not whether the result was foreseeable, but whether it was expected." 2008 UT 1, ¶ 11. The Court correctly noted that, if foreseeability were part of the analysis, insurers would "never have a duty" to indemnify their policy holders:

> If foreseeability were the measure of what constitutes an accident, then [insurers] . . . would never have a duty to indemnify policy holders, rendering coverage completely illusory. Under traditional notions of tort law, individuals are liable for only the foreseeable harm of their negligent acts. Therefore, if an injury is unforeseeable, the insured would not be liable and the insurer would have no duty to indemnify. If, on the other hand, an injury is foreseeable, the insurer could avoid the duty to indemnify by asserting that the injury was not an accident."

*Id.* n. 7.

Cincinnati points to *H.E. Davis & Sons, Inc. v. N. Pac. Ins. Co.*, 248 F. Supp. 2d 1079 (D. Utah 2002) to argue that foreseeability matters in the "occurrence" analysis. App. 3, p.10. There, Utah's federal district court held that because it was foreseeable that poorly compacted soil could result in damage to the concrete footings there was no accident and thus no occurrence. *H.E. Davis*, 248 F. Supp. 2d at 1084. But *H.E. Davis* is a federal opinion that does not control Utah law, is contrary to Utah law, was decided before *Caleb* and *Helf*, and has been criticized by later Utah federal district court opinions.

For example, in *Cincinnati Ins. Co. v. AMSCO Windows*—a case where Cincinnati was a party and represented by the same firm representing it in this matter, with identical policy language defining an "occurrence"—the court noted that *H.E. Davis*'s foreseeability approach had been "explicitly rejected by the Utah Supreme Court" in *Caleb*. 921 F. Supp. 2d 1226, 1248 (D. Utah 2013).

The *AMSCO Windows* case is instructive here. There, AMSCO's windows were allegedly defective resulting in water damage to the interiors and exteriors of multiple residential homes. *Id.*

13

at 1232. Cincinnati, as it does again here, alleged that there was no accident or occurrence because the damages were caused by defective work and it was foreseeable that such defective work would cause the water damage. *Id.* at 1253. The court rejected this argument. It held that "where defective workmanship causes damage to property other than the work product itself . . . such damage results from an accidental 'occurrence' within the meaning of [the] CGL policy language." *Id.* at 1260. This holding was affirmed on appeal to the Tenth Circuit. *Cincinnati Ins. Co. v. AMSCO Windows*, 593 Fed. Appx. 802, 808 (10th Cir. 2014).

The same is true here. Green Property's allegedly defective blown-in insulation caused water damage to property (the roof sheathing) other than the insulation itself. Thus, "such damage results from an accidental occurrence within the meaning of [the] CGL policy language." *AMSCO Windows*, 921 F. Supp. 2d at 1260.

Property damage to the roof's sheathing is not the "natural" or "expected" consequence of blowing insulation into an attic. It is *unexpected*, which under the Policy and Utah case law means it was an "accident" or "occurrence" and is covered under the Policy.

## II. Cincinnati's claimed exclusions do not apply.

Cincinnati's complaint and denial letter allege that even if there was an occurrence, two of the Policy's exclusions apply to bar coverage: (1) the "Your Work" exclusion and (2) the "Fungi" exclusion. App. 3, pp.9-10; ECF 2, ¶19(b)–(c). "An insurer may limit its obligations to provide coverage by exclusions phrased in language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Am. First Credit Union v. Kier Const. Corp.*, 2013 UT App 256, ¶ 8, 314 P.3d 1055 (cleaned up). Ambiguity or uncertainty in exclusions should be construed in favor of coverage and strictly

construed against the insurer. *United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521–22 (Utah 1993). Unlike the question of coverage (where the burden was on Green Property), the burden to prove that exclusions apply is on Cincinnati. *LDS v. Capitol Life Ins. Co.*, 765 P.2d 857, 859 (Utah 1988). Thus, Cincinnati must prove "conclusively" that Green Property's coverage is clearly and unmistakably excluded and that none of the claims are potentially covered. Cincinnati fails to meet this high burden for either exclusion.

### A. The "Your Work" exclusion does not relieve Cincinnati of its duty to defend.

Cincinnati says that it has no duty to defend Green Property because of the Policy's "Your Work" exclusion. App. 3; ECF 2, ¶19(b). This exclusion says the following:

> **l. Damage To Your Work**
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

App. 1, p.19. "Your work" means Green Property's work, operations, materials, parts, or equipment:

> 22. "Your work":
>   a. Means:
>     (1) Work or operations performed by you or on your behalf; and
>     (2) Materials, parts or equipment furnished in connection with such work or operations.
>   b. Includes:
>     (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
>     (2) The providing of or failure to provide warnings or instructions.

15

*Id.* at p.30. It does not exclude coverage for damage to the property of third parties. *Id.*

Here, most of the damage alleged in the Washington Lawsuit is for water damage to the Association's property, the roof's sheathing. Green Property did not supply the sheathing or perform any work on the roof or its sheathing. It simply blew insulation into the attic. Thus, this property damage is not excluded from coverage by the "Your Work" exclusion.

To be sure, the Washington Lawsuit does allege some damage that *may* fall under the "Your Work" exclusion. For example, it alleges that the "ventilation ports must be cleared from blown-in insulation blockage, and baffles must be installed before the original insulation may be raked back into place." App. 2, ¶15. But this does not relieve Cincinnati of its duty to defend for the damages to the roof's sheathing.

### B. The "Fungi" exclusion does not relieve Cincinnati of its duty to defend.

Cincinnati also says it has no duty to defend Green Property because of the Policy's "Fungi" exclusion. App. 3; ECF 2, ¶ 19(c). The Fungi Exclusion excludes coverage for damages "caused directly or indirectly, in whole or in part, by . . . any 'fungi' or bacteria." App. 1. "Fungi" is defined as "any type or form of fungus, and includes, but is not limited to, any form or type of mold, mushroom or mildew and any my-cotoxins, spores, scents or byproducts produced or released by fungi." *Id*. According to Cincinnati, the Washington Complaint "allege[s] that [Green Property] blocked the ventilation system causing moisture build up and causing blackening plywood and fungus that must be repaired or replaced." App. 3, p.10. Cincinnati misstates the Washington Complaint's allegations.

The Washington Complaint does not allege mold (or fungus) caused all or even part of the damage. Instead, it alleges the blocked vents "created a lack of proper ventilation in the attics

16

which led to excess moisture buildup in the attics. This in turn spread moisture condensation on the exposed plywood surfaces" (App. 2, ¶13) which "resulted in significant damage to the roof plywood sheathing in the buildings." *Id.* ¶ 14. The alleged cause of the damage is moisture buildup, not mold. True, the Washington Complaint does state that the Association "observed heavy black discoloration on some of the plywood sheathing in varying degrees within each building." *Id.* ¶ 12. But discoloration does not equal mold. The only mention of mold comes in paragraph 14, where the Association alleges that the moisture has "resulted in **concerns** about the spread of mold spores and other airborne organics in the residential units." *Id.* ¶ 14 (emphasis added). Yet it goes on to state that these mold concerns are "**still being investigated**." *Id.* (emphasis added).

At this point it is uncertain how much, if any, damage is related to fungus or mold. And "[w]here factual questions render coverage uncertain," as is the case here, "the insurer **must defend** until those uncertainties can be resolved against coverage." *Benjamin*, 2006 UT 37, ¶ 22 (emphasis added). Until Cincinnati can meet its heavy burden to prove "**conclusively**" that the damages alleged in the Washington Complaint are solely and entirely caused by mold, it must defend Green Property. *AMSCO Windows*, 921 F. Supp. 2d 1226, 1236–37.

### III. Green Property should be awarded attorney fees due to Cincinnati's bad faith.

An insurer must act in good faith when deciding whether to accept a tender of defense from its insured. *Black v. Allstate Ins. Co.*, 2004 UT 66, ¶ 20, 100 P.3d 1163. This good-faith duty "contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Id.* at ¶ 19 (cleaned up). "These performances are the essence of what the insured has bargained and paid for, and the insurer has an obligation to

perform them." *Id.* (cleaned up). Where an insurer fails to act in good faith in performing these duties, as is the case here, the court must award the insured its costs and attorneys' fees in litigating the coverage dispute. *Id.*; *see* Utah Code Ann. § 78B-5-825; *Am. States Ins. Co., W. Pac. Div. v. Walker*, 486 P.2d 1042, 1044 (Utah 1971).

Here, Cincinnati attempted to circumvent its duty to defend Green Property by relying on the foreseeability analysis in *H.E. Davis & Sons, Inc. v. N. Pac. Ins. Co.*, 248 F. Supp. 2d 1079 (D. Utah 2002). *See* subsection I.C above. Citing *H.E. Davis*, Cincinnati argued it has no duty to defend Green Property because the water damage to the roof's sheathing was the foreseeable result of Green Property's defective work, and thus was not an accident or occurrence. App. 3, p.10. Cincinnati's argument is an attempt to render its Policy illusory, which is bad faith in itself. Cincinnati compounds its bad faith by relying on a holding from *H.E. Davis* that is known by Cincinnati and its council to no longer be good law.

In *Cincinnati Ins. Co. v. AMSCO Windows*, the Court found that the reasoning in *H.E. Davis* related to foreseeability and what is an "occurrence" had been "explicitly rejected by the Utah Supreme Court." 921 F. Supp. 2d 1226, 1248 (D. Utah 2013). The *AMSCO Windows* opinion belabored this point in 20-plus pages of analysis of Utah state and federal opinions on the issue. *Id.* at 1236–61. After this exhaustive review, the Court held that "where defective workmanship causes damage to property other than the work product itself . . . such damage results from an accidental 'occurrence' within the meaning of [the] CGL policy language." *Id.* at 1260. This holding was affirmed on appeal to the Tenth Circuit. *Cincinnati Ins. Co. v. AMSCO Windows*, 593 Fed. Appx. 802, 808 (10th Cir. 2014).

18

Cincinnati was a party to the *AMSCO Windows* case, represented by the same law firm that represents it in this matter. It then appealed the district court's decision to the Tenth Circuit and lost again. It knew—better than anyone—that *H.E. Davis*' foreseeability analysis was rejected. Yet it continues to cite *H.E. Davis* as grounds for denying defense and indemnity to its insureds, including Green Property. It must stop this bad faith behavior. Green Property has incurred thousands of dollars in costs and attorneys' fees as a result of Cincinnati's efforts to render its insurance policy illusory. Green Property is entitled to recover these losses.

## CONCLUSION

Cincinnati has no valid reason to refuse its defense of Green Property in the Washington Lawsuit. There was an "occurrence" and none of Cincinnati's alleged exclusions apply. Cincinnati should be required to pay Green Property's costs and fees incurred in this declaratory judgment action and immediately do what it knows it should have done from the start: defend Green Property in the Washington Lawsuit.

DATED this 18th day of June, 2019.

            SKOUBYE NIELSON & JOHANSEN, LLC

            By: */s/ David R. Nielson*
               David R. Nielson
               Nathan D. Anderson
               *Attorneys Green Property*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of June 2019, a true and correct copy of the foregoing was filed electronically and served via the CM/ECF system on the persons identified below:

Barbara K. Berrett
Kyle C. Thompson
Berrett & Associates, L.C.
Washington Federal Building, Suite 1050
405 South Main Street
Salt Lake City, Utah 84111
*Attorneys for Cincinnati*

*/s/ Dusty France*